Argued and submitted February 12, Springfield High School, Springfield, reversed and remanded September 4, petition for review allowed December 24, 2014 (356 Or 638)

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 75, LOCAL 2043,
*Respondent,*

*v.*

CITY OF LEBANON,
*Petitioner.*

Employment Relations Board
UP1411; A152059

336 P3d 519

John E. Kennedy argued the cause for petitioner. With him on the brief was The Morley Thomas Law Firm.

Giles Gibson argued the cause and filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

**TOOKEY, J.**

The City of Lebanon seeks judicial review of an order of the Employment Relations Board (the board) in which the board concluded that the city committed an unfair labor practice against respondent (the union), in violation of ORS 243.672(1)(a) and (b),[1] when Margaret Campbell, a city councilor, wrote a letter criticizing unions and sent it to a local newspaper. We review the board's order for errors of law pursuant to ORS 183.482(8), and we reverse.

The following facts are either taken from the board's factual findings or stipulated to by the parties. According to the City of Lebanon Charter of 2004, the city is "a municipal corporation" that includes "all territory encompassed by its boundaries * * *." The city is also a public employer as defined by ORS 243.650(20). All powers of the city are vested in the city council, which is composed of a mayor and six councilors; the council delegates much of that power to the city administrator (manager), who is the "administrative head of the government of the City." Specifically, the city administrator (manager) is "responsible for the daily operation of the City's departments and implementation of Council policy."

The council is responsible for holding regular meetings, adopting "rules for the government of its members and proceedings[,]" and appointing certain city officers. The council is also responsible for passing ordinances and voting on questions before it, including whether to approve "a bond of a City officer or a bond for a license, contract or proposal[.]" Except as the city charter provides, "the concurrence of a majority of the members of the Council present and voting at a Council meeting shall be necessary to decide any question before the Council." Further, "[n]o action by

---

[1] ORS 243.672 provides, in part:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

the council shall have legal effect unless the motion for the action and the vote by which it is disposed of take[] place at proceedings open to the public."

Campbell was appointed as a city councilor in 2010 and was a member of the budget committee. As a city councilor, she would "be asked to vote and ratify any collective bargaining agreement with the Union that [was] negotiated by the City negotiation team." However, Campbell was not a member of the city's labor negotiation team, and, "[o]ver the last 10 years, no city councilor [had] been a member of the City's labor negotiation team."

At the time of the events giving rise to this case, the city was experiencing a budget crisis, and the city and the union were parties to a collective bargaining agreement that was set to expire. The president of the union, along with the president of another union that represents city employees, co-authored a letter to the city. In that letter, the union presidents stated that the city should consider eliminating the positions of assistant city manager/human resources manager and human resources assistant before cutting essential services or laying off union workers.

Shortly thereafter, Campbell sent a letter to the *Lebanon Express*, a local newspaper. The letter was addressed to "All Citizens of Lebanon[.]" Campbell began the letter by stating:

> "I would like to inform all of you about some elements of my personal background before I get to the basis of my letter. Further I would like to clarify this letter is being written by me as an individual and not a reflection of a majority of the City Council, the City or my employer."

Campbell then described her and her family's involvement with unions, defended the city's human resources positions, and criticized unions in general. Campbell concluded the letter by stating:

> "To employees of the City and other organizations imprisoned by the dictatorship of a union as a private citizen I advise you to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors. As an individual and former union member

I believe you can put your union dues to better use in your own household budget and in supporting causes that truly express your own values.

"Sincerely,
Margaret A. Campbell
City Councilor
Ward II"

The newspaper published an article that summarized Campbell's letter. That article noted that the letter could be found on the newspaper's website and stated that Campbell planned to read the letter at a city council meeting. The parties later stipulated that Campbell did not read the letter at the meeting.

The union thereafter filed an unfair labor practice complaint against the city. In its complaint, the union alleged that the city "is a public employer under ORS 243.650(20)" and that "the comments in [Campbell's] letter were delivered by Councilor Campbell in her official capacity." The city filed a motion to make the union's complaint more definite and certain, moving "that the Complainant be required to specifically allege whether it assert[ed] that Ms. Campbell is a 'public employer' or whether Ms. Campbell is the City's 'designated representative' as those terms are used in ORS 243.672 and defined in ORS 243.650(20) and (21)." The union filed an amended complaint, adding the following language: "Ms. Campbell is a representative and authorized agent of the City and a 'designated representative' as that term is used in ORS 243.672 and ORS 243.650(21)." In its answer, the city raised an affirmative defense against the union's claim—*viz.*, that the "Union's Complaint fails to state a claim because it fails to allege sufficient facts that Ms. Campbell was the City's 'designated representative.'"

The parties submitted the case to an administrative law judge on stipulated facts, and the matter was submitted directly to the board. The board concluded that the city violated ORS 243.672(1)(a) and (b) through Campbell's act of advising city employees "'to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors.'"

In reaching that conclusion, the board stated that a "public employer is liable for the actions of its officials[.]" It then stated, "Because [Campbell] spoke as the City's representative, liability for her remarks is ascribed to the City * * *." The board specifically rejected the city's "affirmative defense against the Union's claim[.]" The board stated that Campbell was "a member of a six-person Council in which the City Charter vests all powers. The Council *is* the public employer, and Campbell shares that status because she is a member of the Council." (Emphasis in original.) The board relied upon *OPEU v. Jefferson County*, 18 PECBR 310, 317 (1999), in which the board concluded that a county committed an unfair labor practice when one of its commissioners called a union president to "arrange a meeting so he could address the whole bargaining unit about the bargaining dispute between the County and [the union]." In a footnote, the board further stated, "Councilor Campbell, as a member of the council that is responsible for formulating all City policies and overseeing all City operations, is a public employer."

On judicial review, the city contends that the board erred in holding that Campbell's "personal statement of opinion criticizing the local union and union membership violated ORS 243.672(1)(a) and (b) because a single rogue councilor is not a 'public employer' or its 'designated representative' under ORS 243.672." The city asserts that Campbell is not a "designated representative" because she is not the "representative" of the City of Lebanon—that is, she was never "specifically designated" by the city "to act in its interests in all matters dealing with employee representation, collective bargaining and related issues." ORS 243.650(21). The city further asserts that Campbell is not a "public employer" and does not share the status of a "public employer"; according to the city, "individual city councilors have no authority to take action or make decisions on behalf of the City" because the power to act on the city's behalf "is vested solely to the body of the Council through a majority vote."

In response, the union argues that "[i]ndividual City Councilors *are* 'public employers' within the meaning of the PECBA [(Public Employee Collective Bargaining Act)]

when they interfere as such with employees' exercise of their rights under ORS 243.662[.]" (Emphasis in original.) The union also argues that it is appropriate to broadly apply "agency, estoppel, and apparent authority principles in order to hold employers responsible for the unfair labor practices that are committed on their behalf, even by third parties." To support that argument, the union cites federal case law and decisions of the National Labor Relations Board construing the National Labor Relations Act, on which PECBA was modeled. Specifically, the union cites *National Labor Relations Board v. American Furnace Co.*, 158 F2d 376 (7th Cir 1946), in which an employer's president and superintendent authorized the town's mayor to make an antiunion speech to employees on the employer's premises during work hours.

As noted, ORS 243.672(1) provides that it is an unfair labor practice for a "public employer or its designated representative" to commit certain acts. In its amended complaint, the union alleged that the city is a public employer under ORS 243.650(20).[2] The union further alleged that "Ms. Campbell is a representative and authorized agent of the City and a 'designated representative' as that term is used in ORS 243.672 and ORS 243.650(21)." On review, the city and the union appear to agree that, if Campbell is a "designated representative," the city can be held liable under ORS 243.672 for any unfair labor practice that she committed. Thus, we focus our analysis on the question whether Campbell is the city's "designated representative."

When interpreting a statute, our goal is to discern legislative intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d

---

[2] As noted, the union argues on judicial review that "[i]ndividual City Councilors *are* 'public employers' within the meaning of the PECBA when they interfere as such with employees' exercise of their rights under ORS 243.662[.]" (Emphasis in original.) That argument appears to suggest that the city might be liable for any unfair labor practice committed by Campbell because Campbell, herself, was a "public employer." We do not understand why that is necessarily so; rather, it would appear that, if Campbell were a public employer, she would be liable for any unfair labor practice that she committed.

In any event, we need not resolve that question because Campbell is not, in fact, a public employer, as that term is defined by ORS 243.650(20). To the extent that the board's order appears to suggest that Campbell *is* a public employer because she is a member of the council or because she "shares that status" with the city, the board's order is incorrect.

1042 (2009). We first look to the statutory text and context to determine the plain meaning of the statute. *Id.* When a term is defined by a statute, we look to the statutory definition, but when a term is not statutorily defined, we look to dictionary definitions to ascertain the plain meaning of terms. *See id.* at 175 (using dictionary definitions to discern the plain, natural, and ordinary meaning of terms). We also consider changes in the text of a statute over time, as those changes "are context for interpreting the version at issue in a given case." *Montgomery v. City of Dunes City*, 236 Or App 194, 199, 236 P3d 750 (2010). If it is useful to our analysis, we also consider legislative history. *Gaines*, 346 Or at 172.

As noted above, ORS 243.672 provides, in part:

"(1) It is an unfair labor practice for a public employer or its *designated representative* to do any of the following:

"(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

(Emphasis added.)

The first issue in this case is whether Campbell is a "designated representative." Because PECBA does not define "designated representative," we rely on the definition of "public employer representative" in ORS 243.650(21) to determine whether Campbell is a "designated representative" under ORS 243.672(1). *See Service Employees Int'l Union Local 503 v. DAS*, 202 Or App 469, 476, 123 P3d 300 (2005), *rev den*, 341 Or 140 (2006) (stating that there is no statutory definition of "designated representative" and relying on the definition of "public employer representative" in ORS 243.650(21) to determine that the Department of Human Services was not the "designated representative" of the Home Care Commission under ORS 243.672(1)). For purposes of PECBA, ORS 243.650(21) defines a "public employer representative" as follows:

"'Public employer representative' includes any individual or individuals specifically designated by the public employer to act in its interests in all matters dealing with

employee representation, collective bargaining and related issues."

Based solely on the statutory text, we cannot determine whether Campbell is a "designated representative." We note that the adverb "specifically" can mean "with exactness and precision : in a definite manner." *Webster's Third New Int'l Dictionary* 2187 (unabridged ed 2002) (boldface in original). We also note that the verb "designate" can mean "to choose and set apart (as by public will or in the process of government administration)." *Id.* at 612. Those definitions indicate that a "designated representative" must be specifically chosen to act on a public employer's behalf in certain definitive matters—that is "all matters dealing with employee representation, collective bargaining and related issues." ORS 243.650(21).

However, we also note that ORS 243.650(21) uses "includes" as opposed to "means." Whereas "means" is used in a definition to restrict the meaning of a word, "'[i]ncludes' is used if the definition extends the meaning." *State v. Fox*, 262 Or App 473, 483, 324 P3d 608 (2014) (citing Office of Legislative Counsel, *Bill Drafting Manual* § 7.2 (2012)). The legislative assembly's use of the term "includes" suggests that the legislative assembly intended the definition of "public employer representative" to be "open-ended[.]" *See id.* (stating that the legislature's use of the term "includes" in ORS 162.005 (1971) "is evidence that it intended the enumerated examples to be open-ended rather than exclusive"). Accordingly, ORS 243.650(21) encompasses not only those who are "specifically designated by the public employer to act in its interests in all matters dealing with employee representation, collective bargaining and related issues[,]" but also a broader class of individuals. The statutory text of ORS 243.650(21), however, does not address the scope of that class.

We therefore look to context—that is, changes in the text over time. The provisions of ORS 243.650 were originally enacted in 1963 as part of House Bill 1288. Or Laws 1963, ch 579, § 2. At that time, PECBA did not define the phrase "public employer representative" and "public employer" was defined to mean "the state, county or city or any political

subdivision or agency thereof." Or Laws 1963, ch 579, § 2(4) (codified as *former* ORS 243.710 (1963), *repealed by* Or Laws 1969, ch 671, § 1). In lieu of that definition, the following definition of "public employer" was enacted in 1969:

> "'Public employer' means the state and any of its agencies and institutions, and includes a city, county or other political subdivision that has requested the Public Employe[e] Relations Board under section 4 of this 1969 Act to make its services and facilities available for the purpose of establishing public employe[e] representation."

Or Laws 1969, ch 671, § 2(5). The legislative assembly amended the definition of "public employer" in 1973 and again in 1987. *See* Or Laws 1973, ch 536, § 1(18); Or Laws 1987, ch 792, § 1(18). Then, in 1995, the legislative assembly created two separate definitions—one for "public employer" and one for "public employer representative"—that are now codified as ORS 243.650(20) and (21):

> "**(20)** 'Public employer' means the State of Oregon [*or any*], **and the following** political [*subdivision*] **subdivisions**: [*therein, including*] Cities, counties, community colleges, school districts, special districts, **mass transit districts, metropolitan services districts, public service corporations or municipal corporations** and public and quasi-public corporations. [*"Public employer"*]

> "**(21)** '**Public employer representative**' includes any individual **or individuals specifically** designated by the public employer to act in its interests in **all matters** dealing with [*public employees*] **employee representation, collective bargaining and related issues**."

Or Laws 1995, ch 286, § 1(20), (21) (boldface, brackets, and italics in original).

In light of those changes, we conclude that Campbell is not a "designated representative." As can be seen from the text, the legislative assembly used more specific language to define "public employer representative" than it had previously used to define "public employer." First, the legislative assembly added the adverb "specifically" to modify "designated." Second, the legislative assembly added limiting language to describe the duties of a "public employer representative." Thus, under ORS 243.650(21), a "public employer

representative" must have been "specifically designated"—that is, the public employer must have taken specific action to indicate its intent to designate a particular representative to act in the public employer's interests in certain definitive matters: "all matters dealing with employee representation, collective bargaining and related issues."

Because we infer that the legislative assembly intended the 1995 amendment to ORS 243.650 to have a limiting effect despite its retention of the word "includes" in the statutory definition of "public employer representative," we determine that ORS 243.650(21) does not include an individual city councilor who attends regular city council meetings and votes on general questions that come before the council, even if those actions relate to matters that concern public employees.

The second issue in this case is whether we should, as the union suggests, broadly apply "agency, estoppel, and apparent authority principles in order to hold [the city] responsible" for Campbell's act of writing and sending her letter to the newspaper. The union raises an interesting question by asserting that we should apply agency principles in this case: whether a public employer can be liable for an unfair labor practice committed by an agent other than its designated representative.[3] However, we need not resolve that question because, even assuming without deciding that it is appropriate to apply agency principles in this context, we conclude that Campbell was not acting as the city's agent when she wrote and sent her letter.

---

[3] We note that the term "agent" does not appear in ORS 243.650(20) and (21) or ORS 243.672(1). We also note that, when the legislative assembly intends to communicate that a principal is liable for the acts of its "agents," it knows how to do so. *See, e.g.,* ORS 30.265(1) (providing, in part, that "every public body is subject to civil action for its torts and those of its officers, employees and *agents* acting within the scope of their employment or duties" (emphasis added)); ORS 401.667 (providing that certain emergency health care providers and other health care providers, as well as health care facilities and persons operating emergency health care centers, are *"agents of the state* under ORS 30.260 to 30.300" for purposes of certain claims (emphasis added)). However, we also note that it is sometimes appropriate to invoke common-law agency principles to impose liability, even when the word "agent" does not appear in a statute. *See Badger v. Paulson Investment Co., Inc.,* 311 Or 14, 23, 803 P2d 1178 (1991) (concluding that common-law principles of agency are available to impose liability against nonsellers of securities under ORS 59.115(1)).

Under the theory of apparent agency, apparent authority "arises when the agent does not possess the actual or implied authority to act for the principal in the matter, but the principal has clothed the agent with apparent authority to act for the principal in that particular." *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 24, 803 P2d 1178 (1991) (internal quotation marks omitted). In other words, "[a]pparent authority is created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief." *Id.* (internal quotation marks omitted). Apparent authority can be created by appointing a person to a position, "which carries with it generally recognized duties; to those who know of the appointment there is an apparent authority to do the things ordinarily entrusted to one occupying such a position[.]" *Id.* at 25 n 9 (internal quotation marks omitted).

In *Badger*, the Oregon Supreme Court determined that there was sufficient evidence of an apparent agency relationship between an investment company and its two registered representatives to impose liability on the company for the representatives' alleged engagement in fraudulent securities practices and the sale of unregistered securities. In so concluding, the court considered the following factors: the company employed the representatives; the company sent its customers letters announcing a representative's association with the company; one representative sent out letters on the company's stationery; both representatives made sales presentations on the company's premises; at least one of those sales presentations occurred during business hours; and at no time was there any notification that the representatives, when selling securities, were acting on their own behalf. *Id.* at 25-26.

Our analysis of those factors indicates that Campbell was not acting as the city's apparent agent when she wrote and sent her letter. As a city councilor, Campbell was responsible to attend regular city council meetings and vote on questions before the council—questions involving the adoption of rules, the appointment of city officers, the passage of ordinances, the approval of bonds, and the ratification of

collective bargaining agreements. Thus, although Campbell was a city councilor, there is no evidence that writing public letters was one of the things "ordinarily entrusted" to one occupying Campbell's position, and the city's conduct in appointing Campbell as councilor cannot reasonably be interpreted to mean that the city consented to have Campbell write a letter to the newspaper on its behalf. *Id.* at 25 n 9 (internal quotation marks omitted). There is also no evidence that Campbell wrote her letter on the city's stationery, while on city property, or during business hours. Thus, this case is distinguishable not only from *Badger*, 311 Or at 14, in which a representative sent out letters on the company's stationery, but also from *American Furnace Co.*, 158 F2d at 376—which is cited by the union—in which the employer's president and superintendent authorized the town's mayor to make an antiunion speech to employees on the employer's premises during work hours. Further, as noted, Campbell clarified that her letter was "being written by me as an individual and not a reflection of a majority of the City Council, the City or my employer." Thus, this case is further distinguishable from *Badger* because Campbell, in her letter, notified the public that she was acting on her own behalf.[4]

In sum, we conclude that the board erred when it concluded that the city committed an unfair labor practice based on Campbell's act of writing a letter criticizing unions and sending it to a local newspaper.

Reversed and remanded.

---

[4] This case is also distinguishable from *OPEU*, 18 PECBR 310, 317 (1999), in which the board concluded that a county committed an unfair labor practice when one of its commissioners called a union president to "arrange a meeting so he could address the whole bargaining unit about the bargaining dispute between the County and [the union]." Although the commissioner stated that he had initiated the call on his own, expressed frustration that his personal business had been picketed, and stated that he did not want to talk again with a certain member of the union bargaining unit, his "stated reason for calling" was official county business. *Id.*

Here, in contrast, Campbell did not state that she was writing her letter to conduct official city business, and the parties stipulated that Campbell did not read her letter at an official city council meeting.